Filed 9/24/15  In re Mason S. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re MASON S., a Person Coming Under the Juvenile Court Law. | B260316 (Los Angeles County Super. Ct. No. DK06888) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. KAREN C. et al., Defendants and Appellants. | |

APPEALS from an order of the Superior Court of Los Angeles County.  Connie R. Quinones, Judge.  Reversed.

Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant Karen C.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant Jonathan V.

Richard D. Weiss, Chief Deputy County Counsel, Dawyn R. Harrison, Assistant County Counsel, Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother Karen C. and Father Jonathan V. appeal from the order entered after the juvenile court made jurisdictional findings against them under Welfare and Institutions Code section 300, subdivision (b)[1], in relation to their son, Mason S. Mother and Father contend that substantial evidence does not support the jurisdictional findings. We agree and reverse the order.

**FACTUAL AND PROCEDURAL BACKGROUND**

1.    *The Section 300 Petition and Detention*

On August 4, 2014, the Department of Children and Family Services (DCFS) received a referral alleging emotional abuse of the child by Mother indicating that Mother and Father "were arguing in the car. Once home, [M]other went inside the home and got a hammer and commenced to smashing the car windows. While [M]other was smashing the windows, [F]ather was hit." (Italics omitted.)

Later that day, the social worker interviewed Father (then age 21), who reported that, about 9:30 p.m. on August 2, he, Mother (then age 18) and the child (then age one) "were coming from a friend['s] house . . . [and] once they came home [M]other took [the child] in the home because he was sleeping. [Father] . . . stayed in the car . . . as he was waiting for a parking spot to become available on the street. . . . [M]other then came back outside and requested for him to come in the home. [Father] . . . told [Mother] that he was not going to come in the home at that time. . . . [T]hey began to argue about that and then the next thing he sees is [M]other busting the car windows with a hammer. . . . [Father] report[ed] that [M]other has never gotten mad to this level before. . . . [Father] reports that he did obtain a cut on his head but . . . did not require medical attention. . . . [A]s he was putting plastic over his windows the police came. . . . [The child] did not witness the windows being broken but during the course of the commotion . . . he did wake up. . . . [Father] stated that he loves [M]other and wants to be in a relationship with her and he does not know what [set] her off in this manner. . . . [M]other was arrested on

_____

**1**    Statutory references are to the Welfare and Institutions Code unless otherwise noted.

2

the night of the incident. Father indicated that he was not going [to] obtain a restraining order against [Mother] as they were still going to be in a relationship. . . . [T]he plan was for [Mother] to come back to the home with him to live." Father reported that neither drugs nor alcohol was a factor in the incident. Father, Mother and the child lived with the paternal grandmother.

The social worker also interviewed Mother on August 4. According to Mother, the incident occurred after she had been drinking, and she did not remember the details but Father "'was probably talking shit. He had to be to make me go off like that.'" Mother said the child was in the home with a paternal aunt when she smashed the car windows, but she later brought him outside because he had awakened. The paternal grandmother and her significant other, whom DCFS also interviewed, said that when they arrived at the home after the incident Mother was holding the child outside the home.

The next day, the social worker questioned Father about the discrepancy in the reports given by him and Mother. Father "admitted to buying the beer when they went to the store . . . [and] that they went by a friend's home but [the friend was] not home, so they [went] back [to their] home. . . . [Father] went in the home to assist [Mother] with putting [the child] in the home because he was [a]sleep. . . . [Father] then came back outside to sit in his car. . . . [H]e took a 'few sips' of the beer and he did not want it anymore. . . . [Mother] then began to drink the beer and she finished it. . . . [Father] did not initially tell [the social worker] about the alcohol because they were not 'drunk like that.'" The social worker asked Father about giving Mother alcohol "as she is under the age of 21. He indicated that []her mother ([Mother's] mother) allows her to drink at family parties." On August 6, Mother told the social worker that "the beer that she drunk was the beer that [Father had] purchased." Mother said that she had been released after her arrest, desired to remain in a relationship with Father and "was given a stay away order for [Father]." She planned to stay with her mother. On August 8, DCFS obtained an order allowing it to remove the child from Mother's care. The child remained with Father.

On August 14, DCFS filed a section 300 petition, alleging as relevant under subdivision (b) that "[o]n 08-02-14, . . . [M]other . . . and . . . [F]ather . . . engaged in a violent altercation, in which the mother broke the father's vehicle window with a hammer resulting in broken glass cutting the father's face inflicting a bleeding laceration to the father's face. On 08-02-14, the mother was arrested for the domestic violence. Such violent conduct on the part of mother against the father endangers the child's physical health and safety and places the child at risk of physical harm, damage and danger." At the detention hearing, also on August 14, the juvenile court found a prima facie case for detaining the child and released him to Father. The court ordered family maintenance services and monitored visitation for Mother with Father not to serve as the monitor. The court gave DCFS discretion to allow Mother to return to the home.

2.      *Jurisdiction and Disposition*

In the jurisdiction and disposition report, DCFS indicated that Mother had reported that she and Father "'have been together for 3 years and we have never had a problem like that before. We were fine before that night. [Father] had bought a beer and he only took one sip of it and didn't drink the rest so I finished it. It had been at least a year before that that I drank the last time. I don't drink all the time. It was a Mickey's 40 ounce beer and I drank the whole thing. I remember being in jail that night but I don't remember everything that happened. I remember we had gone out and we made it back home and I put the baby to sleep and we were just chilling outside. I think I asked him to come inside and he said "no" and I think that's what got me mad. It was a one time incident. Nothing has ever happened like that before.'"

DCFS also reported that Father had stated, "'We have been together for 2 years. Our relationship was regular. We didn't have no problems before. It was just that one day. We had just come back from our friend's house. I had went to the store and bought a beer. I was gonna drink it but I decided not to. So she drank it. We were outside here in the front. About 30-40 minutes later after she drank the beer, she wanted me to come inside and I didn't so she started getting mad. She went and got a hammer off of the porch and started breaking the windows on my car. I got a cut from some of the glass

4

that was breaking. I never saw her act like that before. I don't know who called the police. I was outside putting plastic bags on my windows and the police came and asked me what happened. It was like 40 minutes later after she broke the windows. The baby was in the house asleep. He had fell asleep in the car when we were coming back home. When she was upset, my mom had calmed her down. So when the police came, everything was over. I had stayed outside while she was in the house calming down. When the police came they said they got a call for domestic violence and they asked where she was. So they came inside the house and arrested her. I told them not to arrest her, but they took her because of the windows.'"

In the report, DCFS concluded that "[t]he child may safely remain in the care of [F]ather . . . . Father appears committed to protecting the child from [M]other and provides the child with the basic necessities of life with the support of the child's paternal grandmother." The child was developmentally on track and did not exhibit any mental or emotional problems. As to Mother, DCFS noted that she had maintained consistent contact and visitation with the child since his detention from her and recognized the August 4 incident as an "isolated" one. Given the restraining order against Mother as to Father, DCFS stated it could not "support [M]other returning to the family home" until such time as the order is amended to allow the parents to reside together. DCFS recommended family maintenance services for Father and family reunification services for Mother, including parenting education, anger management and participation in Alcoholics Anonymous meetings.

DCFS later obtained a copy of the police report from August 3, which indicated that Mother had called the police and told the officers when they arrived that Father "'wanted to get high in the car and asked [Mother] to go to bed and watch the baby.' . . . [M]other reported that [F]ather . . . 'put his hands on her' and that he 'tried to choke [her].' Mother made the statement that [F]ather 'put his hands on her' on at least two occasions during her law enforcement interview." Based on the police report, DCFS recommended that Father submit to on demand and random drug testing and participate in domestic violence counseling. DCFS remained opposed to Mother returning to the

5

family home, "particularly in light of information/statements that seem[] to suggest that [F]ather initiated the conflict by wanting to use drugs and attempting to 'choke' [M]other . . . ."

At the jurisdiction and disposition hearing on October 23, Father testified and denied Mother's allegations against him in the police report. He stated that he wanted to live with Mother and raise the child as a family. Mother testified that she did not drink on a regular basis before the August 2 incident and had not drunk since then. She was attending parenting classes and had gone to six Alcoholics Anonymous classes as ordered by the criminal court. Mother admitted that on August 2 she had hit Father's car window and his head with a hammer. She said Father had not tried to choke her and could not explain why the officers indicated that in their report other than that she "was mad." Mother indicated that the child was in the house during the incident with Father.

The juvenile court sustained the section 300, subdivision (b), allegation against Mother and Father and found the child to be a person described by that section. According to the court, "I don't know if they were having a disagreement or having some problems in their relationship, but it appears one party was under the influence and one party was not. It appears [F]ather was not, and it appears [M]other had drank a 40-ounce . . . beer, which is a lot of beer and it's malt liquor which is more potent. I think it's more than just an accident, number one; and I think it's more than a one-time incident. I don't think [M]other has a drinking problem, but I do think that the drinking on that night enhanced perhaps an argument that was being had by mom and dad. Do I think it will happen again? I'm not sure. But I always have to look at risk for the child. And these are young people. They are just starting out as parents and starting out as being a couple at this three years together." The court released the child to the parents, but directed them not to live together unless the restraining order against Mother were lifted. It ordered family preservation services and continued the case under section 360,

subdivision (b).**2** Mother and Father timely appealed. (§ 395, subd. (a)(1); see

*In re Tracy Z.* (1987) 195 Cal.App.3d 107, 112 [jurisdictional findings reviewable on appeal from order following disposition].)**3**

## DISCUSSION

"The purpose of section 300 is 'to identify those children over whom the juvenile court may exercise its jurisdiction and adjudge dependents.' [Citation.]" (*In re A.O.* (2010) 185 Cal.App.4th 103, 110.) To determine that a child is one described by section 300, the juvenile court must find by a preponderance of the evidence that the allegation in the petition is true. (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318; see § 355, subd. (a).) We review findings under section 300 for substantial evidence and will affirm the a dispositional order based on those findings if they are supported by reasonable, credible evidence of solid value. (*Matthew S.*, at p. 1319.)

To establish jurisdiction under section 300, subdivision (b), the juvenile court must find that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . ." "A jurisdictional finding under section 300, subdivision (b)[,] requires: '"(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the child, or a 'substantial risk' of such harm or illness." [Citation.]' [Citations.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135.) When the jurisdictional finding is "based on the parent's 'inability . . . to adequately supervise or protect the child[]'" DCFS must show "parental unfitness or neglectful conduct." (*In re Precious D.* (2010)

---

**2**      Section 360, subdivision (b), provides that, "[i]f the court finds that the child is a person described by Section 300, it may, without adjudicating the child a dependent child of the court, order that services be provided to keep the family together and place the child and the child's parent or guardian under the supervision of the social worker for a time period consistent with Section 301."

**3**      During the pendency of the appeal, we granted Mother's request for us to take judicial notice of the juvenile court's April 23, 2015 minute order and the fact that on that date the juvenile court terminated its jurisdiction over the child. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

7

189 Cal.App.4th 1251, 1254.) The risk of serious physical harm or illness is assessed as of the time of the hearing on jurisdiction. (*In re Janet T.* (2001) 93 Cal.App.4th 377, 388.)

Substantial evidence does not support the juvenile court's jurisdictional findings against Mother and Father under section 300, subdivision (b). At the time of the jurisdiction and disposition hearing, Father was caring for the child and, according to DCFS, was doing a good job, and the child had no issues. Mother was maintaining her monitored visitation and participating in her ordered programs. She could not yet return to the family home because of a restraining order. Although the court said it did not believe the episode of Mother's drinking and violence with the hammer was an isolated incident, no evidence supports that finding. Both Mother and Father reported it as an isolated incident, as did the paternal grandmother with whom Mother and Father had resided with the child before the incident. Even DCFS recognized it as a one-time incident, both in terms of Mother's drinking and her acting violently. And the court said it did not believe Mother had a drinking problem.[4] The child was in the home when Mother hit the car window and Father with the hammer and thus was not at risk during the event. No evidence suggests that other incidents occurred between Mother and Father to indicate the child might be at substantial risk of serious physical harm or illness. Both Mother and Father appeared committed to their relationship and to caring for the child as a family. As a result, no evidence shows ongoing violence or a likelihood of continuation of violence between Mother and Father that would create a substantial risk of serious physical harm or illness to the child. (See *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 [jurisdictional findings under § 300, subd. (b), reversed when there was no "evidence that the violence is ongoing or likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm"].)

---

[4] Indeed, the juvenile court declined to sustain an allegation in the petition that related to Mother's drinking.

**DISPOSITION**

The order is reversed.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

LUI, J.

9